# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT D. POGUE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:08CV1886 HEA(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Robert D. Pogue for Supplemental Security Income under Title XVI of

the Social Security Act. The cause was referred to the undersigned United States Magistrate

Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a

Brief in Support of the Complaint. (Document Number 13). Defendant has filed a Brief in

Support of the Answer. (Doc. No. 15).

## Procedural History

On December 18, 2006, plaintiff filed his application for benefits, alleging that he became

unable to work due to his disabling condition on September 1, 1992. (Tr. 81-83). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated August 29, 2008. (Tr. 44-47, 7-17).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on November 20, 2008.  (Tr. 5-6, 1-4).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

## Evidence Before the ALJ

A.    **ALJ Hearing**

Plaintiff's administrative hearing was held on July 10, 2008.  (Tr. 20).  Plaintiff was

present and was represented by counsel.  (Id.).  Plaintiff's mother, Pamela Haywood, was also

present.  (Id.).  The ALJ began the hearing by admitting a number of exhibits into the record.  (Tr.

21).

The ALJ then examined plaintiff, who testified that he was twenty-two years of age.  (Tr.

22).  Plaintiff stated that he lived with his mother and his fifteen-year-old brother.  (Id.).  Plaintiff

testified that his mother drove him to the hearing.  (Id.).  Plaintiff stated that he has a valid

driver's license but he does not have a car.  (Id.).  Plaintiff testified that, when he took the driver's

test, the questions were read to him through headphones.  (Tr. 23).  Plaintiff stated that he

graduated from the special education program at Roosevelt High School in St. Louis City.  (Id.).

Plaintiff testified that he has not attended any type of vocational school or college.  (Id.).

Plaintiff stated that he works with Life Skills.  (Id.).  Plaintiff testified that Life Skills

helped him look for a job and complete job applications.  (Id.).  Plaintiff stated that he had been

involved with Life Skills since he graduated from high school four years prior to the hearing.

(Id.).  Plaintiff testified that Life Skills picked him up every week and took him to look for a job

until he found one.  (Id.).  Plaintiff stated that he found a part-time job at a warehouse about a

year after he graduated from high school.  (Tr. 24).  Plaintiff stated that he worked at this position

for about a year, until he was laid off. (Id.). Plaintiff testified that he cleaned and shrink-wrapped pallets at this position. (Id.).

Plaintiff stated that, at the time of the hearing, he had a job at the Western Hotel sorting towels and sheets. (Tr. 25). Plaintiff testified that he had been working at this position for about two months. (Id.). Plaintiff stated that he found this job through Life Skills. (Id.). Plaintiff testified that his hours had recently been cut and that he only works two days a week. (Id.). Plaintiff stated that he previously worked five days a week. (Id.). Plaintiff testified that his hours were cut because he was taking too many breaks and was not clocking in on time. (Id.). Plaintiff stated that he takes the bus to work. (Id.).

Plaintiff testified that between the warehouse job and the hotel job he worked during the summer cleaning at Slate. (Tr. 26). Plaintiff stated that he worked at this position a few years prior to the hearing. (Id.).

Plaintiff testified that when he is not working, he usually gets up around 11:00 a.m. or 12:00 p.m. and goes to bed at about 9:00 p.m. (Id.). Plaintiff stated that he has no difficulty taking care of his personal needs. (Tr. 27). Plaintiff testified that the only chore he does is take out the trash. (Id.). Plaintiff stated that he does not do any yard work. (Id.).

Plaintiff testified that he pled guilty to distributing marijuana. (Id.). Plaintiff stated that he was caught with a baggie of marijuana while riding in a car. (Id.). Plaintiff testified that he served a two-year term of probation for this offense. (Id.). Plaintiff stated that he has no other convictions. (Tr. 28). Plaintiff testified that he does not currently use marijuana, although he has used it in the past. (Id.).

Plaintiff stated that, when he is not working and leaves his house, he goes to his son's

mother's house. (Id.). Plaintiff testified that either his mother takes him to see his son or his son's mother picks him up. (Id.). Plaintiff stated that he also goes to a park by his house and plays basketball. (Id.).

Plaintiff testified that he does not take any medications. (Tr. 29). Plaintiff stated that he does not see doctors for any reason. (Id.).

Plaintiff testified that he is unable to read. (Id.). Plaintiff stated that, if his mother gave him a grocery list, he would be unable to read it. (Id.). Plaintiff testified that if his mother read him a list, he would probably remember some of the items. (Id.).

Plaintiff stated that he plays video games as a hobby. (Id.). Plaintiff testified that he does not play video games with anyone else. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he has two video games-NBA Live and Pac Man. (Tr. 30). Plaintiff stated that he does not play any computer games. (Id.). Plaintiff testified that he does not know how to use a computer. (Id.). Plaintiff stated that Life Skills has set up an email address for him and they check the emails for him. (Id.). Plaintiff testified that he is unable to check his email independently and that he has never sent an email. (Id.).

Plaintiff stated that, when he applies for jobs, Life Skills completes the applications for him. (Tr. 31). Plaintiff testified that he was connected with Life Skills through his mother and his school. (Id.).

Plaintiff stated that he is unable to read the bus schedule. (Id.). Plaintiff testified that when Life Skills gets him a job, they tell him which bus to use. (Id.). Plaintiff stated that he just looks for the bus number. (Id.). Plaintiff testified that Life Skills finds jobs for him that are in bus

range.  (Id.).  Plaintiff stated that he has been riding the bus with his mother for many years.  (Id.).

Plaintiff testified that when he worked at the shrink-wrapping position, he had a job coach. (Id.).  Plaintiff stated that the job coach came to the job site until they felt that he understood the job.  (Id.).

Plaintiff testified that Life Skills got him the job that he had at the time of the hearing.  (Tr. 32).  Plaintiff stated that, at the time of the hearing, he still had a job coach at this position.  (Id.). Plaintiff testified that the job coach had not been coming to the job site recently and that his supervisor told him that the job coach should come.  (Id.).  Plaintiff stated that he believed that this was the reason his hours had been cut.  (Id.).  Plaintiff testified that he did not believe that he needed the job coach there, although he did not want to lose his job over his failure to clock in. (Id.).  Plaintiff stated that his supervisor has been telling him that he needs to step it up and work faster.  (Id.).  Plaintiff testified that, when his job coach is present, she watches him and makes sure he is doing his job, clocking in on time, and taking his breaks.  (Id.).  Plaintiff stated that he occasionally forgets to clock in.  (Id.).

Plaintiff testified that his current employer gives him a paycheck.  (Id.).  Plaintiff stated that he does not have a bank account and that he has never had a bank account.  (Id.).  Plaintiff testified that he believed that his mother could help him maintain a checkbook.  (Id.).  Plaintiff stated that he was unable to add and subtract well.  (Id.).  Plaintiff testified that he was able to count money and change.  (Id.).  Plaintiff stated that he occasionally makes purchases by himself, if he is not spending a large amount of money.  (Id.).  Plaintiff testified that if he makes a large purchase, he would not know the proper amount of change.  (Id.).  Plaintiff stated that he asks his

mother to help him make large purchases. (Id.). Plaintiff testified that his mother cashes his check and gives him the money. (Id.).

Plaintiff stated that he has to undergo drug testing to get jobs, including his current job. (Tr. 34). Plaintiff testified that he has never failed a drug test. (Id.). Plaintiff stated that he stopped using marijuana because he was on probation. (Id.). Plaintiff testified that he was never addicted to marijuana. (Id.).

Plaintiff stated that he does not do any yard work. (Id.). Plaintiff testified that his stepfather does the yard work. (Id.). Plaintiff stated that he has never used a lawnmower. (Id.). Plaintiff testified that his mother would not allow him to use the lawnmower when he was younger. (Id.).

Plaintiff stated that he cooks Ramen Noodles. (Tr. 35). Plaintiff testified that he does not read the instructions. (Id.). Plaintiff stated that he watched someone make them and he was told that the noodles are done when they fall apart. (Id.). Plaintiff testified that he cannot read directions to cook because he is unable to read. (Id.).

Plaintiff stated that when he plays basketball in the park, he usually goes with his cousins. (Id.). Plaintiff testified that he does not have any friends in his neighborhood. (Id.). Plaintiff stated that he only socializes with his family. (Id.). Plaintiff testified that he does not see any of his high school friends. (Id.). Plaintiff stated that he gets along with people. (Tr. 36). Plaintiff testified that he does not go out and make friends because he is not talkative. (Id.).

Plaintiff stated that when he works, he always fears that he will encounter something that he is unable to do. (Id.). Plaintiff testified that he likes to work but fears that he will experience difficulty with job tasks. (Id.).

The ALJ then re-examined plaintiff, who testified that he graduated from high school in 2004. (Id.). Plaintiff stated that he was eighteen or nineteen when he graduated from high school. (Tr. 37).

The ALJ then examined vocational expert, W. Glen White, who testified that he was present during plaintiff's testimony and he had reviewed the file. (Tr. 38). Dr. White stated that plaintiff has no past relevant work as described by the rules and regulations of the SSA. (Id.).

The ALJ asked Dr. White to assume a hypothetical individual of plaintiff's age, education, and work experience, with no physical limitations but who is limited to simple and/or repetitive work and is unable to perform jobs that require the ability to read instructions. (Id.). The ALJ asked Dr. White whether there were any jobs in the economy that such an individual could perform. (Tr. 39). Dr. White testified that, if he had not heard the testimony of plaintiff, there would be some jobs that plaintiff could perform with the limitations set forth by the ALJ. (Id.). Dr. White stated that, after hearing plaintiff's testimony, he did not believe that plaintiff could engage in competitive employment because he requires close supervision and constant watching. (Id.). Dr. White testified that if plaintiff required a job coach or if the supervisor had to consistently redirect plaintiff to his job duties, these limitations would preclude competitive employment. (Id.).

Dr. White stated that if plaintiff did not have these additional limitations, then he would be capable of performing some assembly jobs, of which there exist about 8,000 in the St. Louis metropolitan area. (Id.). Dr. White testified that plaintiff could also perform some cleaning jobs, of which about 15,000 exist in the St. Louis area. (Tr. 40). Dr. White stated that if plaintiff required additional mentoring or direction or observation, this would preclude competitive

employment.  (Id.).

Plaintiff's attorney then examined Dr. White, who testified that, based on his experience as a vocational expert, the record was consistent with the need for special supervision or a job coach.  (Id.).

## B.  **Relevant Medical Records**

The record reveals that plaintiff presented to Joseph W. Monolo, Licensed Psychologist, for a Psychological Evaluation at the request of the state agency on February 20, 2007.  (Tr. 358-61).  It was noted that plaintiff alleged a learning disability.  (Tr. 358).  Plaintiff's mother reported that plaintiff received special education services in high school due to a diagnosis of learning disabled, which was later changed to a diagnosis of mental retardation in high school.  (Id.).  Mr. Monolo noted that plaintiff displayed no overt anxiety and adjusted easily to evaluation.  (Tr. 359).  Plaintiff's attention was satisfactory, but his effort and persistence varied as he was sometimes quick to claim a lack of knowledge or not be thoughtful in his approach to tasks.  (Id.).  Plaintiff's test-taking behaviors improved somewhat with structure and reinforcement.  (Id.).  Mr. Monolo administered the Wechsler Adult Intelligence Scale-Third Edition, which revealed a Verbal IQ of 66, Performance IQ of 67, and Full Scale IQ of 64.[1]  (Id.).  Mr. Monolo stated that plaintiff's scores indicated overall functioning in the mild range of mental retardation,[2] which was

_____

[1]Mild Mental Retardation is characterized by an IQ score of 50 -55 to approximately 70. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 40 (4th Ed. 1994).

[2]"Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of 'educable.'  This group constitutes the largest segment (about 85%) of those with the disorder.  As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental

consistent with school records indicating a special education diagnosis of mental retardation. (Tr. 360). Mr. Monolo concluded that plaintiff's presentation, which was marked by concrete thinking, brief verbal replies and a flat affect, was consistent with the upper limit of the mild range of mental retardation. (Tr. 360). Mr. Monolo stated that plaintiff's cognitive limitations interfere with his ability to adapt to the environment, as he can make only simple purchases independently, cannot independently read correspondence or complete paperwork, and cannot accurately complete some tasks without supervision. (Id.). Mr. Monolo found that plaintiff is capable of understanding, remembering and following simple directions within the implied limitations of his overall cognition. (Id.). He stated that plaintiff's concentration and persistence were satisfactory during evaluation with reinforcement and would be compromised in a work setting if he is given tasks beyond his level of ability and for which he has not been properly trained. (Id.). Mr. Monolo concluded that "[i]n light of his overall functioning, he would seemingly perform best in routine, repetitive jobs, which minimize academic skills." (Id.). Mr. Monolo found that plaintiff was not capable of independently managing his finances. (Id.).

Judith McGee, Ph.D. completed a Mental Residual Functional Capacity Assessment on February 27, 2007. (Tr. 364-366). Dr. McGee found that plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr. 364-65). Dr. McGee stated that plaintiff is capable of performing simple, repetitive work in the national economy. (Tr. 366).

Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate support, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings." DSM-IV at 41.

Dr. McGee also completed a Psychiatric Review Technique. (Tr. 367-77). Dr. McGee diagnosed plaintiff with mild mental retardation. (Tr. 370). Dr. McGee expressed the opinion that plaintiff had no difficulties in maintaining social functioning; mild restriction of his activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 375).

**C.    School and Vocational Records**

The record reveals that plaintiff was enrolled in special education classes at St. Louis Public Schools beginning in kindergarten. (Tr. 507). At plaintiff's initial evaluation, he was diagnosed as learning disabled. (Id.).

The Wechsler Intelligence Scale for Children was administered on March 26, 1997, which revealed a verbal IQ score of 79, a performance IQ score of 82, and a full scale IQ of 79.[3] (Tr. 208). It was noted that these scores placed plaintiff's level of intellectual ability in the borderline range. (Id.).

In a February 13, 2003, Reevaluation Report, it was noted that plaintiff was in the special education program and his diagnosis was mental retardation. (Tr. 466). At that time, plaintiff was in the eleventh grade and was outside the regular class more than sixty percent of the time. (Id.). Plaintiff's teacher estimated that plaintiff was functioning at the second to third grade level academically in math, reading, and language. (Tr. 467). Plaintiff was functioning in the low average range of cognitive ability. (Id.). It was noted that plaintiff made friends easily and spent most of his time talking instead of working. (Id.). Plaintiff required the following

---

[3]Borderline intellectual functioning is defined by an IQ in the 71-84 range. See DSM-IV at 684.

accommodations during district-wide assessments: extended time, multiple sessions, not timed, breaks during test, small group testing, location with minimal distractions, interpreting directions, clarifying directions, provide examples of test items, and simplifying directions. (Tr. 192). Plaintiff required the following instructional modifications and accommodations: extended time for oral response extended time for written response, allow breaks/vary activities, individual/small group instruction, present by demonstration (model), provide short instructions (1 or 2 steps), use adapted or simplified texts and material, use high interest/motivating materials, use positive/concrete reinforcement, check often for understanding/review, repeated review/drill, frequent/immediate feedback, lower difficulty level, and shorten assignments. (Tr. 193).

Records from Paraquad, Inc. reveal that plaintiff was hired by Taft in August 2004 and that plaintiff received job coaching throughout the months of August and September of 2004. (Tr. 173-74). On November 3, 2004, it was noted that plaintiff was doing well at work and that he had been working extra hours on Saturdays to help pay for legal fees. (Tr. 173).

Plaintiff participated in a Community-Based Assessment through Life Skills at Motors and Armatures (Warehouse) on November 13, 2006. (Tr. 155). Plaintiff was properly dressed for the site. (Id.). Plaintiff's duties for the day involved working in the Shipping and Receiving department individually removing boxes from an assembly belt, loading boxes onto a trailer, stacking them in an organized manner and ensuring that the boxes were secure. Other duties involved shrink wrapping full pallets, which plaintiff was successfully able to perform after being shown twice. (Id.). Plaintiff was required to operate the machine and ensure that the pallet was wrapped appropriately and to remove boxes from the belt and place them onto separate pallets based on their item number. (Id.). Plaintiff worked at an appropriate speed and showed no signs

of fatigue when attending this site. His quality of work was described as above average. (Id.).

Plaintiff's attention to detail was efficient as he made no mistakes itemizing any products and

determining which one needed to be brought to different locations of the warehouse. (Id.).

Plaintiff shrink-wrapped appropriately and was able to learn this duty effectively upon being

shown twice on how to perform the job. (Id.). It was noted that plaintiff does not read well but

was able to match the item numbers appropriately and had the appropriate academic skills

required for this position. (Id.). Robert was described as shy and reserved and he was reminded

to ask questions if he was unsure of how to perform a specific duty. (Id.). It was noted that,

upon employment, a job coach could assist plaintiff in asking for assistance when unsure of what

to do. (Id.).

In a Life Skills Assessment Report dated December 3, 2006, Bryant Nalagan noted that

plaintiff was laid off from his position at Taft in April 2005, when the company went out of

business. (Tr. 152). Mr. Nalagan stated that plaintiff would like to work full time and receive

benefits. (Id.). Mr. Nalagan stated that plaintiff "would be most successful in an environment

that would offer natural supports from his employer and job coaching assistance." (Tr. 153).

In a Monthly Progress Report-Job Development dated July 17, 2007, SESP

Representative Erin Jones noted that plaintiff was properly dressed for an interview at Target.

(Tr. 138).

In plaintiff's Monthly Progress Report-Job Development dated November 26, 2007,

Jennifer Massie, SESP representative noted that she picked plaintiff up for a scheduled meeting

and plaintiff was wearing a button-down shirt and dark jeans. (Tr. 124). Ms. Massie reminded

plaintiff that he needs to wear clothes that are for interviewing, such as khaki pants and dress

shirt.  (Id.).  Ms. Massie noted in plaintiff's Monthly Progress Report-Job Development dated

January 7, 2008 and January 22, 2008 that plaintiff was dressed in a button down dress shirt with

jeans.  (Tr. 122, 121).  On both occasions plaintiff apologized and indicated that he would wear

proper clothing for the next appointment.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant has not engaged in substantial gainful activity since December 18, 2006, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.     The claimant has the following severe impairment: mental retardation (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations.  He is limited to simple and/or repetitive work.  He cannot perform jobs that require reading instructions.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on May 10, 1986 and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant completed high school in special education but is basically illiterate (20 CFR 416.964).

8.     Transferability of jobs skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national

economy that the clamant can perform (20 CFR 416.960(c) and 416.966).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since December 18, 2006, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12-16).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on December 18, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 17).

## Discussion

**A.   Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.     Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See</u> <u>id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See</u> <u>id.</u>  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059

(8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  <u>See</u> <u>id.</u>  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); <u>Jones v. Callahan</u>, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.  <u>Plaintiff's Claims on Appeal</u>

Plaintiff first argues that the ALJ failed to properly consider whether plaintiff's impairment met listing 12.05C. Plaintiff next argues that the ALJ failed to consider significant evidence in determining plaintiff's residual functional capacity. The undersigned will address plaintiff's claims in turn.

## 1.  **Listing 12.05C**

Plaintiff argues that the ALJ erred in finding that plaintiff did not meet Listing 12.05C, the listing for mental retardation. Defendant contends that the ALJ properly determined that plaintiff did not meet Listing 12.05C.

The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing. <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004). To meet a listing, an impairment must meet all of the listing's specified criteria. <u>Id.</u> An impairment that manifests only some of these criteria, no matter how severely, does not qualify. <u>Id.</u> (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)). Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion. <u>Pepper ex rel Gardner v. Barnhart</u>, 342 F.3d 853, 855 (8th Cir. 2003).

Listing 12.05C sets out the following:

> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the

impairment before age 22.

       The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\*\*\*

       C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1.

The ALJ found that plaintiff did not meet 12.05C because he does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  (Tr. 14).  The ALJ stated that, although plaintiff has been diagnosed with mental retardation and school records show that plaintiff had problems academically, in 1997 plaintiff obtained a verbal IQ score of 79, performance IQ score of 82, and a full scale IQ score of 79.  (Id.).  The ALJ stated that these scores suggest that plaintiff functions at a higher cognitive level than his mental retardation diagnosis indicates.  (Id.).  The ALJ also noted that there is no objective evidence in the record that plaintiff has a physical or other mental impairment that imposes an additional and significant work-related limitation.  (Id.).

Plaintiff first argues that the ALJ erred in failing to mention plaintiff's most recent IQ scores resulting from Mr. Monolo's February 2007 consultative examination.  Mr. Monolo administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), which revealed a valid verbal IQ score of 66, performance IQ score of 67, and a full scale IQ of 64.  (Tr. 359).  Plaintiff points out that these scores are within the range required by 12.05C, which requires a valid verbal, performance, or full scale IQ of 60 to 70.

The Commissioner is not required to accept a claimant's IQ scores, and may reject scores that are inconsistent with the record. See Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). "Indeed, test results of this sort should be examined 'to assure consistency with daily activities and behavior.'" Id. (quoting Popp v. Heckler, 779 F.2d 1479, 1499 (11th Cir. 1986) (per curiam)). The appropriate question is whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole. See id.

In this case, although the ALJ referred to Mr. Monolo's findings throughout his opinion, he did not acknowledge the IQ scores found by Mr. Monolo. The ALJ did, however, accept Mr. Monolo's diagnosis of mental retardation. (Tr. 12). This diagnosis was based, in part, on the IQ scores found by Mr. Monolo. The ALJ did not articulate a basis for discrediting Mr. Monolo's IQ scores and the record does not reveal any inconsistencies that would suggest the scores are invalid.

The undersigned finds that, despite the ALJ's error in failing to acknowledge Mr. Monolo's IQ scores, the ALJ's determination that plaintiff did not meet Listing 12.05C is supported by substantial evidence. In order to meet Listing 12.05C, plaintiff must demonstrate that he has a physical or other mental impairment imposing an additional and significant work-related limitation of function. Plaintiff fails to meet this requirement.

Plaintiff does not allege any physical impairments. Rather, plaintiff contends that he suffers from a "learning disability," which qualifies as an "other mental impairment." In support of this argument, plaintiff cites to several SSA forms that list plaintiff's alleged disabling condition as learning disability, along with a school record from March 1997 that indicates plaintiff was enrolled in a learning disability program in his elementary school. (Tr. 44, 94, 206).

Plaintiff's school records reveal, however, that plaintiff's diagnosis was changed from learning disability to mental retardation. In a February 13, 2003, Reevaluation Report, it was noted that plaintiff was in the special education program and his diagnosis was mental retardation. (Tr. 466). There is no mention of an additional learning disability. Further, plaintiff's mother reported to Mr. Monolo's that plaintiff's diagnosis was changed from learning disability to mental retardation in high school. (Tr. 358). Mr. Monolo diagnosed plaintiff with mild mental retardation and did not include a diagnosis of learning disability. (Tr. 361). In sum, there is no evidence that plaintiff suffers from a learning disability in addition to mild mental retardation. Thus, the ALJ's finding that plaintiff did not meet Listing 12.05C is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this claim.

## 2.     Residual Functional Capacity

Plaintiff next argues that the ALJ erred in determining plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ failed to discuss evidence from Life Skills that plaintiff dressed inappropriately, and evidence from Mr. Monolo's report. Plaintiff also argues that the ALJ failed to consider testimony from the vocational expert that plaintiff required a job coach. Defendant argues that the ALJ's residual functional capacity determination is supported by substantial evidence.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. He is limited to simple and/or repetitive work. He cannot perform jobs that require reading instructions.

(Tr. 14).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

As support for his residual functional capacity determination, the ALJ stated that plaintiff cannot read, and his impairment would be expected to limit his ability to comprehend, remember, understand, follow instructions, and complete tasks. (Tr. 15). The ALJ stated that, despite these limitations, the evidence shows that plaintiff can perform at least simple, repetitive work. (Id.). The ALJ noted that plaintiff's SSA function reports and Life Skills records indicate that plaintiff drove, shopped, and paid bills, which requires at least some cognitive ability. (Id.). The ALJ pointed out that in November 2006, plaintiff worked at an appropriate speed, his attention to detail was efficient, and he learned his duties effectively. (Id.). The ALJ noted that Mr. Monolo found that plaintiff was capable of understanding, remembering, and following simple directions and that plaintiff would perform best in routine, repetitive jobs. (Id.). The ALJ found that the

evidence fails to show that plaintiff requires a job coach in order to maintain employment. (Id.). The ALJ noted that Mr. Monolo did not indicate that plaintiff required the constant supervision of a job coach. (Id.).

The undersigned finds that the residual functional capacity formulated by the ALJ is not supported by substantial evidence. The record reveals that plaintiff is mentally retarded and illiterate. Plaintiff is able to make only simple purchases independently, cannot complete paperwork such as job applications, cannot read a bus schedule, cannot independently care for his son, and cannot accurately complete many tasks without supervision. Plaintiff lives with his mother and relies on her to cash his check for him, provide transportation, and provide other assistance with tasks. Plaintiff has been regularly receiving services from Life Skills and Vocational Rehabilitation since graduating from high school. He had been in special education classes from kindergarten. (Tr. 507-23). Life Skills completes job applications for plaintiff, searches for possible job opportunities for him, set up an email account and checks plaintiff's email, advises plaintiff what to wear for potential job interviews, and picks him up at his home to look for a job until he secures one. This undisputed evidence reveals that plaintiff is largely dependent upon others to complete most basic tasks.

As the court noted earlier, when Dr. W. Glen White was asked whether there were any jobs in the economy that such an individual [as plaintiff] could perform Dr. White testified that, if he had not heard the testimony of plaintiff, there would be some jobs that plaintiff could perform with the limitations set forth by the ALJ. (Tr. 39). Dr. White stated that, after hearing plaintiff's testimony, he did not believe that plaintiff could engage in competitive employment because he requires close supervision and constant watching. (Id.). Dr. White testified that if plaintiff

required a job coach or if the supervisor had to consistently redirect plaintiff to his job duties, these limitations would preclude competitive employment. (Id.).

In Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) the ALJ discounted plaintiff's allegation of pain because the ALJ found the plaintiff's earlier questionnaire statements that she cooked, cleaned, shopped, did laundry, visited friends, attended church and went fishing to be inconsistent with her later testimony that she no longer performed these tasks or required the help of her sons. The Eighth Circuit found that claimant is not required to prove that she is bedridden or completely helpless to be found disabled. Id.; Easter v. Bowen, 867 F.2d 1128, 1130 (8th Cir. 1989).

"To qualify for work at any level the plaintiff must have the ability to perform the requisite tasks of employment on a daily basis." Clive v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991) (citing Thomas, 876 F.2d at 669). This requires the ability to work day in and day out under stressful conditions if one is to have the residual capacity to perform certain types of work. Thomas, 876 F.2d at 669. See also Easter, 867 F.2d at 1130; McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), abrogated on other grounds, 524 U.S. 266, 118 S.Ct. 1984, 141 L.Ed.2d 269 (1998).

A worker must have the ability to find and hold a job in a work environment. Parsons v. Heckler, 739 F.2d 1334, 1340 (8th Cir. 1984). He must be able to perform his work on a sustained basis "in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy, 683 F.2d at 1147.

The ALJ cited the finding of Mr. Monolo that plaintiff was capable of understanding, remembering, and following simple directions and that plaintiff would perform best in routine,

repetitive jobs, in support of his residual functional capacity determination. (Tr. 360). As plaintiff notes, however, the ALJ failed to discuss other findings of Mr. Monolo that support disability. First, although Mr. Monolo found that plaintiff was capable of understanding, remembering and following simple directions, he noted that plaintiff was able to do so only "within the implied limitations of his overall cognition." (Id.). The ALJ omitted this finding from his discussion. Mr. Monolo stated that plaintiff's cognitive limitations interfere with his ability to adapt to the environment, as he can only make simple purchases independently, cannot independently read correspondence or complete paperwork, and cannot accurately complete some tasks without supervision. (Id.). He noted that plaintiff's concentration and persistence were satisfactory during evaluation with reinforcement and would be compromised in a work setting if he is given tasks beyond his level of ability and for which he has not been properly trained. (Id.). Mr. Monolo also concluded that plaintiff was not capable of independently managing his finances. (Id.).

The ALJ concluded that plaintiff did not require a job coach. The evidence of record, however, contradicts this finding. Vocational expert W. Glenn White, Ph.D. testified that, if plaintiff required a job coach or additional supervision or mentoring, all competitive employment would be precluded. (Tr. 39). Plaintiff's attorney then questioned Dr. White as follows:

> [Plaintiff's Attorney]: Based on your review of the file and based on your experience as a vocational expert at colleges, do you think someone with the limitations described in the file would need the special supervision or would need a job coach?

> [Dr. White]: That would be consistent. The record is pretty consistent in the sense of the need for that kind of activity.

(Tr. 40).

At step five of the analysis, the Commissioner bears the burden of demonstrating that a

significant number of jobs exist that plaintiff can perform. See Johnson v. Chater, 108 F.3d 178, 179-80 (8th Cir. 1997). To meet this burden, the Commissioner can rely on the testimony of a vocational expert. See Long v. Chater, 108 F.3d 185, 188-89 (8th Cir. 1997). The purpose of vocational expert testimony is to determine whether jobs exist for someone with plaintiff's precise limitations. Jelinek v. Bowen, 870 F.2d 457, 459 (8th Cir. 1989). An ALJ may not completely ignore the reasoned opinion of qualified vocational experts in favor of the opinion of a government vocational consultant, particularly when the government expert's opinion is elicited through a hypothetical question that does not accurately reflect the factual record. See Jelinek, 870 F.2d at 458, 460 (ALJ's failure to include in hypothetical all tests and findings was error).

In this case, Dr. White testified in response to questioning by plaintiff's attorney that the need for a job coach was consistent with the record. This finding is supported by substantial evidence in the record. Plaintiff has used the services of a job coach at all of his prior positions. Plaintiff testified that his hours had been cut at the job he held at the time of the hearing, which he attributed to the recent absence of his job coach from the job site. (Tr. 32). Plaintiff stated that his job coach makes sure he is performing his job properly, ensures that he clocks in on time, and tells him when to take breaks. (Id.). Plaintiff's mother reported to Mr. Monolo that plaintiff was unable to maintain his past warehouse job due to mistakes when filling orders. (Tr. 358). Plaintiff's mother indicated that plaintiff's work was satisfactory when his job coach was present, but he had less success when unsupervised. (Id.).

The ALJ noted that Mr. Monolo did not indicate that plaintiff required a job coach in order to maintain employment. (Tr. 15). Although Mr. Monolo did not explicitly find that plaintiff required the assistance of a job coach, the need for a job coach is consistent with the

findings in Mr. Monolo's report, specifically Mr. Monolo's statement that plaintiff's concentration and persistence were satisfactory *with reinforcement* and would be compromised in a work setting if he is given tasks beyond his level of ability and for which he has not been properly trained.  (Tr. 360) (emphasis added).  The need for a job coach is also consistent with Mr. Monolo's finding that plaintiff requires supervision to satisfactorily perform many basic tasks.  (Id.).

In support for his finding that plaintiff did not require a job coach, the ALJ also stated that plaintiff appeared to perform adequately at a job in November 2006.  (Id.).  Plaintiff participated in a job assessment through Life Skills at a warehouse on November 13, 2006.  (Tr. 155).  Although plaintiff did perform adequately, this was not a job.  Rather, it was an assessment plaintiff participated in through Life Skills, with representatives from Life Skills presumably present.  As part of this assessment, Bryant Nalagan, a vocational rehabilitation counselor at Life Skills, indicated that plaintiff "would be most successful in an environment that would offer natural support from his employer and job coaching assistance."  (Tr. 153).  Mr. Nalagan also stated that "upon employment, a job coach can assist [plaintiff] in asking for assistance when unsure of what to do."  (Tr. 155).  As such, this assessment supports the finding that plaintiff requires the assistance of a job coach to maintain employment.

In sum, the ALJ's residual functional capacity determination is not supported by substantial evidence in the record as a whole.  The evidence of record reveals that plaintiff requires the assistance of a job coach to maintain employment.  The hypothetical posed to the vocational expert was deficient, as it did not include plaintiff's need for a life coach.  As such, the vocational expert's testimony in response to the ALJ's flawed hypothetical that plaintiff was able to perform work in the national economy is not supported by substantial evidence.  The

vocational expert testified that, if plaintiff required the assistance of a job coach, all competitive employment would be precluded. (Tr. 39). This court finds that because of his constant dependence on others, Plaintiff Robert Pogue is not able to perform his work on a sustained basis in the competitive and stressful conditions in which real people work in the real world. In a case such as this, where the record "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991).

Accordingly, the undersigned recommends that this matter be reversed and remanded to the Commissioner for the award of Supplemental Security Income benefits.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for the award of Supplemental Security Income benefits.


The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).


Dated this __10th__ day of February, 2010.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE